UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| In re: | ) Case No. 14-40497-LKG |
| | ) |
| MICHAEL R. PIOTTER, | ) Chapter 13 |
| | ) |
| Debtor. | ) |
| | ) |
| VANDERBILT MORTGAGE AND | ) |
| FINANCE, INC., | ) |
| | ) |
| Movant, | ) |
| v. | ) |
| | ) |
| MICHAEL R. PIOTTER, | ) |
| Debtor, | ) |
| | ) |
| and | ) |
| | ) |
| BOB G. KEARNEY, | ) |
| Trustee, | ) |
| | ) |
| Respondents. | ) |

## MOTION FOR RELIEF FROM AUTOMATIC STAY
## BY VANDERBILT MORTGAGE AND FINANCE, INC.

Vanderbilt Mortgage and Finance, Inc. ("Vanderbilt"), respectfully states as follows:

1.      Vanderbilt holds a claim secured by certain real property commonly known and numbered as 1105 Mulberry Street, Eldorado, Illinois 62930 (the "Realty") including a 2008 Dutch Housing Dutch Limited Mobile/Manufactured Home, 28 x 66 VIN #210000HDF602498AB, including all fixtures therein located thereon (collectively, the "Property").

2.      A copy of the Manufactured Home Promissory Note, Security Agreement and Disclosure Statement that evidences the indebtedness to Movant is marked as Exhibit 1.

3.    A copy of the Certificate of Title and recorded Mortgage that evidence perfection of Movant's security interest in the Property are marked as Exhibit 2.

4.    The Chapter 13 Plan, which is not yet confirmed, calls for payment to Vanderbilt inside the Plan by the Trustee.

5.    The Debtor is in default of his obligations to Movant for all payments from and after November 1, 2012.

6.    The current balance due and owing to Vanderbilt is approximately $103,284.94.  The total is comprised of the following components:

| | |
|---|---|
| $ 85,289.46 | unpaid principal |
| $ 14,057.87 | accrued interest from 05-20-14  through 06-19-14 |
| $    190.00 | late charges from 10-27-08 through 04-17-14 |
| $ | attorneys' fees |
| $   4,005.21 | advances for taxes, insurance, etc. |
| $   (257.60) | any other charges |
| $103,284.94 | TOTAL |

7.    A copy of the payment history for all post-petition payments due to date is marked as Exhibit 3.

8.    The property has a present value of approximately $36,056.00 according to NADA Guide and Land Appraisal Report.

9.    Cause exists for granting relief from the automatic stay in that the Debtor has failed to make payments to Vanderbilt, Debtor may not have maintained current evidence of insurance on the Property, and the Property was foreclosed upon April 25, 2014, five (5) days before the Debtor filed this bankruptcy case.

10.    Debtor does not have equity in the Property, and such Property is not necessary for an effective reorganization.

11.     Vanderbilt is entitled to immediate relief without further stay because its collateral is declining in value, the uncertainty of insurance coverage exposes the collateral to risk of loss, and the Property has been foreclosed upon.

WHEREFORE, Vanderbilt Mortgage and Finance, Inc. prays that this Court enter its Order granting relief from the automatic stay and authorizing Vanderbilt to exercise its rights under its loan documents and applicable nonbankruptcy laws immediately without any delay or stay under Rule 4001 or otherwise, and for such other relief as the Court deems just and proper.

/S/David G. Wasinger
David G. Wasinger, IlBar #06200269
James S. Cole, IlBar #06314940
THE WASINGER LAW GROUP, P.C.
Magna Place, Suite 875
1401 South Brentwood Boulevard
St. Louis, Missouri 63144
(314) 961-0400; (314) 961-2726 FAX
Attorneys for Vanderbilt Mortgage and
Finance, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served electronically upon the U.S. Trustee, according to the Court's electronic notice procedures, and that a further copy was mailed by U.S. Mail, postage prepaid, this 27th day of May, 2014, to:

Marcus H. Herbert, Attorney for Debtor
Bankruptcy Advocates
308 West Walnut
Carbondale, Illinois 62901

Bob G. Kearney, Trustee
P.O. Box 998
Benton, Illinois 62812

Michael R. Piotter
1105 Mulberry Street
Eldorado, Illinois 62930

/S/David G. Wasinger

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| In re: | ) Case No. 14-40497-LKG |
| | ) |
| MICHAEL R. PIOTTER, | ) |
| | ) Chapter 13 |
| | ) |
| Debtor. | ) |
| | ) |
| VANDERBILT MORTGAGE AND | ) |
| FINANCE, INC., | ) |
| | ) |
| Movant, | ) |
| | ) |
| v. | ) |
| | ) |
| MICHAEL R. PIOTTER, | ) |
| Debtor, | ) |
| | ) |
| and | ) |
| | ) |
| BOB G. KEARNEY, | ) |
| Trustee, | ) |
| | ) |
| Respondents. | ) |

## STATEMENT OF ADDITIONAL ENTITIES WITH INTERESTS IN COLLATERAL

On information and belief, Movant states that the following persons and entities

(other than Debtor, co-Debtor, and Movant) have interests in the Property that is the

subject of the Motion to Lift Stay:

1.    None.


/S/David G. Wasinger
David G. Wasinger, IlBar #06200269
James S. Cole, IlBar #06314940
THE WASINGER LAW GROUP, P.C.
Magna Place, Suite 875
1401 South Brentwood Boulevard
St. Louis, Missouri 63144
(314) 961-0400; (314) 961-2726 FAX
Attorneys for Vanderbilt Mortgage and
Finance, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served electronically upon the Debtors' counsel, and the U.S. Trustee, according to the Court's electronic notice procedures, and that a further copy was mailed by U.S. Mail, postage prepaid, this 27th day of May, 2014, to:

Marcus H. Herbert, Attorney for Debtor
Bankruptcy Advocates
308 West Walnut
Carbondale, Illinois 62901

Bob G. Kearney, Trustee
P.O. Box 998
Benton, Illinois 62812

Michael R. Piotter
1105 Mulberry Street
Eldorado, Illinois 62930

/S/David G. Wasinger

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF ILLINOIS

In re:                                    )  Case No. 14-40497-LKG
                                          )
MICHAEL R. PIOTTER,                       )
                                          )  Chapter 13
                Debtor.                   )
                                          )
                                          )
VANDERBILT MORTGAGE AND                   )
FINANCE, INC.,                            )
                                          )
                Movant,                   )

## SUMMARY OF EXHIBITS

The following exhibit(s) pertain to the Motion for Relief From Automatic Stay filed by Vanderbilt Mortgage and Finance, Inc. on May 27, 2014.

1. Manufactured Home Promissory Note, Security Agreement and Disclosure Statement;

2. Certificate Title and Mortgage on certain real property commonly known and numbered as 1105 Mulberry Street, Eldorado, Illinois 62930 including a 2008 Dutch Housing Dutch Limited mobile/manufactured home showing lien perfection of Vanderbilt; ^and

3. Statement of payment history for post-petition payments due to date.

/S/David G. Wasinger
David G. Wasinger, IlBar #06200269
James S. Cole, IlBar #06314940
THE WASINGER LAW GROUP, P.C.
Magna Place, Suite 875
1401 South Brentwood Boulevard
St. Louis, Missouri 63144
(314) 961-0400; (314) 961-2726 FAX
Attorney for Vanderbilt Mortgage and
Finance, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served electronically upon the Debtors' counsel, and the U.S. Trustee, according to the Court's electronic notice procedures, and that a further copy was mailed by U.S. Mail, postage prepaid, this 27th day of May, 2014, to:

Marcus H. Herbert, Attorney for Debtor
Bankruptcy Advocates
308 West Walnut
Carbondale, Illinois 62901

Bob G. Kearney, Trustee
P.O. Box 998
Benton, Illinois 62812

Michael R. Piotter
1105 Mulberry Street
Eldorado, Illinois 62930

/S/David G. Wasinger

Date **7-21-08**



**MANUFACTURED HOME PROMISSORY NOTE, SECURITY AGREEMENT AND DISCLOSURE STATEMENT**       CONV ☒ FHA ☐ VA ☐

ASSIGNEE: Vanderbilt Mortgage and Finance, Inc.

| | |
|---|---|
| Buyer's Name: **MICHAEL R PIOTTER** | Co-Signer's Name: |
| Buyer's Name: | Co-Signer's Name: |
| Buyer's Address: **1105 MULBERRY ST , ELDORADO , IL 62930** | |

"Buyer" refers to all persons who sign this contract as buyer or co-buyer, jointly and severally. "Seller" refers to the seller. The Seller will submit this contract to Vanderbilt Mortgage and Finance, Inc., P.O. Box 9800, Maryville, Tennessee 37802; and, if approved, the contract will be assigned to Vanderbilt Mortgage and Finance, Inc. Buyer promises to advise Seller in writing of any change of Buyer's mailing address while this contract is in effect. Seller should send any papers or notices concerning the Manufactured Home purchased under this contract to Buyer's mailing address. On the date of this contract, Buyer buys from Seller on a credit sale basis the Manufactured Home described below, together with furnishings, equipment, appliances and accessories included in the Manufactured Home at the time of purchase (collectively called "Manufactured Home").

**PROMISE TO PAY:** Buyer promises to pay Seller the "Unpaid Balance" as listed under "Itemization of Amount Financed" below plus interest from the contract date at the rate of 9.59 % ("Contract Rate"). The "Unpaid Balance" includes any Prepaid Finance Charges advanced for Buyer. Prepaid Finance Charges, if any, shall be deemed fully earned by Seller when Buyer executes this Note. Buyer will pay the loan by making monthly payments in the amount(s) and on the dates listed in the Payment Schedule shown below. Buyer understands that the amount of the regular payment is based upon the assumption that all payments will be made on the scheduled due dates and in the scheduled amounts. If no Contract Rate is disclosed above, the initial interest rate is the Annual Percentage Rate shown below. The finance charge is figured on the assumption that Buyer will make each payment exactly as scheduled. (Buyers payment schedule). If no Contract Rate is disclosed above, the initial interest rate is the Annual Percentage Rate shown below.

**Description of Manufactured Home**        New ☒ Used ☐

| TRADE NAME: DUTCH HOUSING | ADDITIONAL ACCESSORIES AND FURNISHINGS: ITEM AND SERIAL # |
|---|---|
| MODEL: DUTCH LIMI | |
| SERIAL NO: 210000HDF602498AB | |
| SERIAL NO: | |

| ANNUAL PERCENTAGE RATE RATE The cost of Buyer's credit as a yearly rate: | FINANCE CHARGE The dollar amount the credit will cost Buyer: | Amount Financed The amount of credit provided to Buyer or on Buyer's behalf: | Total of Payments The amount Buyer will have paid after Buyer has made all payments as scheduled: | Total Sale Price The total cost of Buyer's purchase on credit including Buyer's down payment of $2,000.00 |
|---|---|---|---|---|
| 10.00 % | $184,930.00 | $85,646.00 | $270,576.00 | $272,576.00 |

Buyer's payment schedule will be:

| Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|
| 360 | $751.60 | Monthly, beginning 9/01/2008 |
| | | Monthly, beginning |
| | | Monthly, beginning |
| | | Monthly, beginning |

Security: Buyer gives Seller a security interest in:
☒ The goods or property being purchased including the Manufactured Home as described above.
☒ Real property located at: 1105 MULBERRY STREET ELDORADO IL 62930
Late Charge: If a payment is more than 15 days late, Buyer will be charged 5% of the unpaid amount of such payment, not to exceed $5.00.
Rebate for Prepayment : At any time, Buyer has the right without penalty to pay this contract in full or to pay more than Buyers schedule requires. Buyer earns the Prepaid Finance Charge when Buyer receives the Home and no part of it will be refunded if Buyer pays in full ahead of schedule.
Assumption: Someone buying the Manufactured Home may be allowed to assume the remainder of Buyer's obligations under this contract on the original terms only if such person is approved by Seller.
See "Additional Terms and Conditions" on reverse side for additional information about nonpayment, default, required payment in full before the scheduled date and prepayment refunds and penalties.



EXHIBIT
1

| ITEMIZATION OF AMOUNT FINANCED: | | |
|---|---|---|
| 1. Cash Price (Including Sales Tax of $5,075.00) .... | | $86,475.00 |
|   Cash Downpayment.......... $2,000.00 | | |
|   Trade-In (Year, Make, Model) N/A | | |
|     Length N/A    Width N/A | | |
|   Trade Allowance N/A   Liens N/A | | |
|   Net Trade-in Allowance   N/A | | |
| 2. Total Downpayment .... | | $2,000.00 |
| .... | | |
| 3. Unpaid Balance of Cash Price (1 minus 2) .... | | $84,475.00 |
| 4. Amounts paid to others on Buyer's behalf | | |
|   a. To Insurance Companies | | |
|     (1) Property Insurance .... | $.00** | |
|     (2) Credit Life Insurance ............. | $.00 ** | |
|   b. To Public Officials | | |
|     (1) Certificate of Title ................... | $65.00 | |
|     (2) Filing Fees ............................... | $179.00 | |
|   c. To .......................................... | $.00** | |
|   d. To .......................................... | $.00** | |
|   e. To .......................................... | $.00** | |
|   f. To .......................................... | $.00** | |
|   g. To APPRAISAL FEE ................... | $275.00** | |
|   h. To .......................................... | $.00** | |
|   i. To TITLE SEARCH ................... | $400.00** | |
|   j. To .......................................... | $40.00** | |
|   k. To .......................................... | $.00** | |
|   l. To ATTORNEY FEE ................... | $477.00** | |
|   m. To DISCOUNT POINTS ......... | $2,569.38** | |
|   n. To TITLE INSURANCE ........... | $252.00** | |
|     Total (Items a. through n.) ..........................$4,217.38 | | |
| 5. Unpaid Balance (3 plus 4) ............................. | | $88,692.38 |
| 6. Prepaid Finance Charges ................ | | $3,046.38 |
| 7. Amount Financed (5 minus 6) ................................. | | $85,646.00 |
| **Seller may retain, or receive, a portion of these amounts | | |

**INSURANCE:**

PROPERTY INSURANCE ON THE MANUFACTURED HOME IS REQUIRED FOR THE TERM OF THIS CONTRACT. BUYER HAS THE RIGHT TO OBTAIN SUCH INSURANCE FROM ANYONE AUTHORIZED BY LAW TO SELL IT.

However, by checking the appropriate box below, Buyer elects to buy through Seller property insurance of the specified coverage, term and premium.

| Type of Insurance | Term | Premium |
|---|---|---|
| ☐ | | |
| ☐ | | |

OPTIONAL HOME BUYER PROTECTION PLAN (HBPP): Buyer protection and service plans are voluntary and are not required to obtain credit. If the box is checked, Buyer has elected to purchase HBPP at the terms shown below.

| Type of Insurance | Term | Premium |
|---|---|---|
| ☐ | | |

CREDIT LIFE INSURANCE IS NOT REQUIRED TO OBTAIN CREDIT AND WILL NOT BE PROVIDED UNLESS BUYER SIGNS AND AGREES TO PAY THE ADDITIONAL COST.

| Type of Coverage | Term | Premium |
|---|---|---|
| ☐ | | |

This insurance may not pay off all Buyer's debt and the exact amount of coverage is shown on Buyer's policy or certificate. If Buyer elects credit insurance, the name(s) of the proposed insured(s) are:
(Only One Buyer (not Co-Signer) may be insured.)

Proposed Insured:            Age:
Buyer's signature indicates Buyer's election to obtain the above marked insurance coverage(s) for the term, premium and proposed insured(s) shown.

| Signature_____ | Date_____ |
|---|---|
| Signature_____ | Date_____ |
| Signature_____ | Date_____ |
| Signature_____ | Date_____ |

**SECURITY INTEREST:** Buyer gives Seller a security interest under the applicable certificate of title law and the applicable Uniform Commercial Code in the Manufactured Home and any property added or attached to it, and if indicated above the real property as described, to secure Buyers obligation under this Contract. If this loan is also secured by a Deed of Trust or Mortgage on my real property, then this security agreement is not exclusive. If and to the extent permitted by applicable law, Buyer agrees that Seller or his assignee may charge and collect from Borrower a reasonable fee for preparing documents related to this transaction, such as applications for certificates of title, financing statements, mortgages and deeds of trust, as well as any amendments to or terminations of any security interests created by any of the foregoing. All rights and remedies under this Note and any Deed of Trust executed herewith are cumulative, but Buyer's right to a written notice of default and 30 days to cure shall not be affected by any inconsistent provision of any Deed of Trust. Buyer also assigns directly to Seller any interest Buyer may have in premium refunds or proceeds under any insurance covering the Manufactured Home. Buyer agrees to execute any application for certificate of title or ownership, financing statement or other document necessary to perfect Sellers security interest in the Manufactured Home. Buyer authorizes Seller to sign Buyer's name to any financing statement or application or other document, which may necessary to perfect the security granted by Buyer herein.

**BUYER'S RIGHT TO PREPAY: BUYER MAY PREPAY ANY AMOUNTS DUE UNDER THIS CONTRACT AT ANY TIME WITHOUT PENALTY.** However, pre-paid finance charges (loan fees, points, finders fees or similar charges), if any, will not be refundable. Buyer has the right to make payments at any time before they are due. Unless Buyer directs Seller otherwise in writing, Seller will apply Buyer's prepayments to reduce the next scheduled payment or payments that Buyer owes under this contract. A partial prepayment will not change the due date or monthly payment amounts.

**PROPERTY INSURANCE:** Buyer is required to insure the Manufactured Home against physical damage for the term of the contract at Buyer's expense, subject to Sellers approval. If Buyer purchased and financed the premium(s), the premium is financed over the term of the loan, even though the term of insurance is less than the loan term. The amount of coverage must provide the types and amounts required by Seller. The insurance policy will contain a loss payable clause protecting Seller (as Seller's interest may appear), and provide for at least a 10 day notice of cancellation to Seller. Buyer agrees to provide written proof of such coverage to Seller at Seller's request within 5 days notice. Buyer has the right to choose the person through whom the property insurance is obtained. If Buyer's insurance coverage expires or is canceled prior to payment in full of this contract, Buyer must obtain no less than the minimum coverage at Buyer's expense for the remaining term of the contract. Should Buyer fail to maintain coverage or fail to provide proof of such insurance, Seller may, but is not obligated, at Seller's sole discretion, to obtain coverage in an amount and type it deems necessary. Buyer agrees that such coverage may cover Seller's interest and Buyer's interest or only Seller's interest. Seller may, at its sole option, insure against losses in amounts equal to the unpaid balance due on the note. Buyer understands the insurance premiums may be higher if Seller purchases the insurance than might be the case if Buyer had purchased the insurance. Seller may purchase the insurance from an affiliated company, which may receive a profit for this service. Seller has no obligation to Buyer to search for any lower cost premiums that may be available to Buyer by other insurance companies.

**ADVANCES TO PROTECT THE MANUFACTURED HOME:** If Buyer fails to pay for required insurance, if Buyer fails to pay park or lot rent (and any other related charges), if Buyer fails to satisfy taxes, assessments, or other liens or encumbrances against the Manufactured Home, if Buyer fails to keep the Manufactured Home in good repair or if Buyer fails to make any other payments required by this contract or applicable law, Seller may (but is not required to) make such repairs or payments Seller chooses. Any and all of such payments made by Seller, and any amounts Seller pays to protect or enforce

Seller's security interest, will be added to the amount Buyer owes Seller on this contract, and will be secured by the Manufactured Home. Buyer agrees to pay interest on these amounts at the Contract Rate provided for in this contract on any such amounts Buyer does not repay immediately. At Seller's sole option, Seller may (1) demand that Buyer repay these amounts immediately, or (2) add these amounts to Buyer's regularly scheduled payments, or (3) add these amounts as additional installments due or (4) add these amounts to the final installment due on this contract.

**DELINQUENCY AND DEFAULT:** Time is of the essence. If a payment is more than 15 days late, Buyer agrees to pay a late charge of 5% of the unpaid amount, not to exceed $5.00. If any check, negotiable instrument of withdrawal or share draft is dishonored and returned to Seller by Buyer's financial institution, Buyer will pay a processing fee of a maximum of $20.00 or the maximum amount permitted by law, whichever is less, in addition to being required to make payment on the item, and late charges. Buyer will be in default on this contract if: (1) Buyer fails to make any payment when due; or (2) otherwise fails to perform any of Buyer's obligations under this contract; or (3) Buyer dies or becomes legally unable to manage Buyer's affairs; or (4) any statement of fact, representation or warranty Buyer makes to Seller in Buyer's loan application, or in any loan document is false, misleading, inaccurate, or incomplete. In the event of Buyer's default, Seller will give Buyer notice of the right to cure the default ("Notice of Default") when required by law. Buyer is not, however, entitled to a Notice of Default more than twice in any one-year period. Under no circumstances is Buyer entitled to a Notice of Default if Buyer has either abandoned or voluntarily surrendered the Manufactured Home, or if other extreme circumstances occur. If Buyer has not cured the default within 30 days after the postmarked date of the notice, Seller may accelerate the maturity of the debt and require Buyer to pay Seller the entire remaining balance due on the contract. Seller may take legal action against Buyer, and Seller may repossess the Manufactured Home. In the event of default, Buyer also agrees to pay Seller's expenses for (a) reasonable attorney's fees, not to exceed 15% of Buyer's unpaid debt, after referral to an attorney who is not Seller's salaried employee; (b) court costs and disbursements; and (c) costs of repossessing the Manufactured Home including the costs of storing, reconditioning, and reselling it. Before Seller sells the Manufactured Home, Buyer can get it back (redeem) if Buyer (1) pays Seller amounts which are past due, including late charges; (2) pays Seller the cost of taking and storing the Manufactured Home and other expenses that Seller incurs; (3) pays Seller all other charges or other expenses to which Seller is entitled under this contract; and (4) cures any other defaults which may have occurred. Buyer's right to redeem will end when the Manufactured Home is sold unless otherwise required by law. Any personal property of Buyer's in or attached to the Manufactured Home which is not subject to Seller's security interest may be held by Seller without liability if the Manufactured Home is repossessed. Buyer will be deemed to have waived any claim thereto unless written demand by certified mail is made upon Seller within ten (10) days after repossession.

**OTHER TERMS AND CONDITIONS:** Buyer will not move the Manufactured Home from the address above without Seller's prior written consent. Buyer will not sell the Manufactured Home without Seller's prior written consent. Buyer will not let the Manufactured Home become part of any real estate. Buyer agrees that the Manufactured Home sold by the terms of this contract is personal property. Unless Seller gives prior written consent, Buyer shall not allow the Manufactured Home to become a part of real estate or to otherwise lose its status as personal property under applicable law, and doing so shall constitute willful and malicious injury to the Manufactured Home and Seller's security interest herein. Buyer will not encumber or abandon the Manufactured Home or use it for hire or illegal activity, nor allow any lot lien, landlord lien, or similar lien to encumber the Manufactured Home. Buyer will pay promptly all taxes and any liens and encumbrances of the Manufactured Home. Buyer will notify Seller promptly of any loss or damage to, or confiscation or theft of the Manufactured Home. When Seller asks for it, Buyer promptly will provide Seller with proof that (1) Buyer has the insurance required under this contract; (2) all taxes assessed against the Manufactured Home have been paid; (3) all park or lot rent (and any other related charges) due has been paid; (4) Seller's lien is the only lien against the Manufactured Home, and (5) the Manufactured Home is in good condition and repair. Seller can inspect the Manufactured Home at any time. If Buyer is married, and residing in a community property state, both Buyer's community property and separate property will be liable for all payments under this contract. Buyer will cooperate with Seller regarding any requests after closing to correct errors made concerning this contract or the transaction and to provide any and all additional documentation deemed necessary by Seller to complete this transaction. Buyer acknowledges that Buyer has examined the Manufactured Home and that, if it is used, Buyer accepts the Manufactured Home as is. The year of the Manufactured Home as specified in this contract is for identification purposes only. Seller may rely on a telecopy or photocopy of this agreement as if it were an original. Buyer acknowledges that any Broker or other third party used to facilitate this transaction may receive compensation from Seller for its services. If the Home Buyer Protection Plan (HBPP) or Credit Life were purchased, the premium(s) are financed over the term of the loan, even though the term of insurance is less than the loan term.

**ARBITRATION (Voluntary Post Dispute Resolution):** Arbitration provides an alternative method for resolving potential disputes regarding transactions such as this one which involve interstate commerce. In the event of a dispute, the parties may agree to refer the matter to arbitration. If such is the case, the following provisions will apply. The arbitration shall be conducted in accordance with the American Arbitration Association's commercial arbitration rules in the state in which the home is located. Each party in such arbitration shall bear their own expenses, and shall be permitted to depose one individual and any expert witness designated by another party. Judgment on the arbitrators' award may be entered in any court of competent jurisdiction. This agreement is entered into for the benefit of not only the parties hereto but also the manufacturer of the Home, the seller of the home, any provider of insurance pursuant to the Contract, and their respective directors, officers, employees, agents, subsidiaries, affiliates, successors, assigns and insurance carriers. Notwithstanding anything to the contrary contained herein, Buyer, Seller and any subsequent holder of the Contract retains an option to use the judicial or non-judicial relief afforded in the Contract and pursuant to applicable law for the repossession of the Home or the enforcement of Buyer's monetary obligation or any other security interest held by such holder.

**CREDIT INFORMATION:** Seller may investigate Buyer's credit history and credit capacity in connection with opening and collecting Buyer's account and share information about Buyer and Buyer's account with credit reporting agencies. Seller may sell or otherwise furnish information about Buyer, including insurance information, to all others who may lawfully receive such information. Seller may furnish specific information about the Manufactured Home and any insurance policies on the Manufactured Home to any insurance agent to enable such agent to quote premiums to Buyer and solicit Buyer's insurance business.

**WAIVER AND MODIFICATION:** Seller's waiver of any default shall not constitute a waiver of any other default. The procurement of required property insurance, or the payment of taxes, or other liens, or other charges, by Seller shall not be a waiver of Seller's right to accelerate the maturity of this contract and declare a default herein.

**WARRANTIES:** Any warranties relating to a new Manufactured Home have been provided to Buyer by Seller, or a warranty company, or the manufacturer in a separate writing, receipt of which Buyer hereby acknowledges. Except as provided in such writing, if any, there are no warranties, express or implied, including but not limited to warranties of merchantability or fitness for a particular purpose. Buyer acknowledges that Buyer has examined the Manufactured Home and that, if it is used, Buyer accepts the Manufactured Home "as is". The year of the Manufactured Home is for identification purposes only. Except to the intent expressly stated herein, or as otherwise required by law, no assignee of this contract shall be liable, either in tort or contract, for any direct or indirect damages or for any special, incidental, or consequential damages arising out of or in connection with this contract or transaction. This disclaimer of warranties does not affect service contracts made with the Seller within 90 days from the date of this contract.

**VALIDITY:** Wherever possible each provision of this contract shall be interpreted in such a manner as to be effective and valid under applicable law, but

Page 3

If any provision of this contract shall be prohibited by or be invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this contract. The contract shall be governed both as to issues of formation and performance, by the laws of the State where the contract was executed by Buyer, provided that to the extent Federal preemption applies, Federal rights and remedies will be applied. This contract shall be of no effect until and unless signed by Buyer and Seller. In no event shall any charge under this contract exceed the highest amount allowed by applicable law. If any charge is determined to be excessive then the amount shall be applied to the Unpaid Balance.

**ASSIGNMENT:** Seller may assign this contract to any person or entity. All rights granted to Seller under this contract shall apply to any assignee of this contract.

**ENTIRE AGREEMENT:** This contract, any separate written warranty and the "Retailer Closing Agreement" constitute the entire agreement between Buyer and Seller. Buyer agrees that no representations, oral or written, have been made to Buyer to induce Buyer to enter into this contract, other than the representations expressly set forth in this contract and in any separate written warranty.

**GUARANTY:** Co-Signer agrees that all amounts owed under this contract will be paid when due. Co-Signer will still be obligated even if Buyer is released or if Seller waives or delays enforcement of any of Seller's rights under this contract. Seller does not have to give Co-Signer notice of any such waiver, delay or release. Co-Signer also has to pay Seller's attorney's fees and other costs of enforcing this guarantee. See attached Notice to Cosigner before signing this guaranty.

**NOTICE TO THE BUYER: 1. DO NOT SIGN THIS DOCUMENT BEFORE YOU READ IT OR IF IT CONTAINS ANY BLANK SPACES. 2. YOU ARE ENTITLED TO AN EXACT COPY OF THE DOCUMENT YOU SIGN. KEEP IT TO PROTECT YOUR LEGAL RIGHTS. 3. LIABILITY INSURANCE COVERAGE FOR BODILY INJURY AND PROPERTY DAMAGE CAUSED TO OTHERS IS NOT INCLUDED UNLESS MOBILOWNERS INSURANCE IS INDICATED IN THE PROPERTY INSURANCE BOX ABOVE. 4. CAUTION: YOU ACKNOWLEDGE RECEIPT OF A COMPLETED COPY OF THIS RETAIL INSTALLMENT CONTRACT CONSISTING OF FIVE (5) PAGES.**

**SELLERS AGREEMENT:** Seller agrees to this contract, and subject to acceptance by Vanderbilt Mortgage and Finance, Inc. at its designated office, assigns it to Vanderbilt Mortgage and Finance, Inc. in accordance with the assignment set forth herein. Notice of acceptance is hereby waived.

Seller    CLAYTON HOMES EVANSVILLE, IN

By _____ Manager
   (Signature)           (Title)

Seller's Address

EVANSVILLE, IN
(City)        (State)

Date of this Contract _____ 7-21-08 _____

CMH Homes Inc.

Sammy Maples, DC-Auditor

**IT IS IMPORTANT THAT YOU THOROUGHLY READ THE CONTRACT BEFORE YOU SIGN IT.**

_____
(Buyer)                    MICHAEL R PIOTTER

_____
(Date)

_____
(Buyer)

_____
(Date)

**GUARANTY OF BUYER'S PROMISES:** The undersigned, separately and together, agree(s) to pay all amounts due on this contract until all amounts due on this contract are paid in full. The undersigned also agree(s) to all the terms and conditions of this contract.

_____
(Co-Signer)

_____
(Date)

_____
(Co-Signer)

_____
(Date)

 

## NOTICE

ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR (BUYER) COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR (BUYER) SHALL NOT EXCEED AMOUNT PAID BY THE DEBTOR (BUYER) HEREUNDER.

(See above for Buyer's and Seller's Signatures)

### ASSIGNMENT BY SELLER

TO VANDERBILT MORTGAGE AND FINANCE, INC. (VANDERBILT): For value received, Seller hereby assigns within contract and all Seller's right, title and interest in it, and its collateral to Vanderbilt Mortgage and Finance, Inc. (Assignee), together with certain warranties and recourse obligations, if any, contained in the underlying agreement between Seller and Vanderbilt.

VANDERBILT MORTGAGE AND FINANCE, INC. assigns _____

the foregoing contract including all amounts payable by buyer and the security interest in the collateral, without recourse.

Date_____ By:_____ Title:_____

IN  Fixed Land/Home - Rev 12/2000



July 23, 2008

Michael R. Piotter                                    Account Number: 
1105 Mulberry St
Eldorado, IL 62930

## NOTICE OF CORRECTION

Dear Mr. Piotter:

On 7/21/08 you executed loan documents with Vanderbilt Mortgage and Finance, Inc. We have just discovered the following error in your documents:

    In your ☒ Contract ☐ Closing Agreement, the <u>year</u> was incorrectly disclosed to you as <u>2007</u>.

    It should have been disclosed to be <u>2008.</u>

On behalf of Vanderbilt, please accept this notification as correction of the error identified above. **This requires no action on your part.** Should you have any questions, please feel free to contact us at the above address and phone. Our office hours are 8:30 a.m. to 5:30 p.m. (EST), Monday through Friday.

                           Yours truly,

                           Vanderbilt Mortgage and Finance, Inc.

STATE OF ILLINOIS

## CERTIFICATE OF TITLE OF A VEHICLE

| VEHICLE IDENTIFICATION NO. | YEAR | MAKE | MODEL | BODY STYLE | TITLE NO. |
|---|---|---|---|---|---|
| 210000HDF802498AB | 2008 | DUTCH HOUSING | DUTCH LIMITED | MOBILE HM | X8240769003 |
| 210000HDF802498AB | | | | | |

| DATE ISSUED | ODOMETER | CCY | PURCHASED | PURCHASE DATE |
|---|---|---|---|---|
| 08/27/08 | | | NEW | 07/21/08 |

MOBILE HOME SQ. FT. 1710

TYPE OF TITLE: **ORIGINAL**

MAILING ADDRESS

VANDERBILT MORTGAGE & FINANCE INC
PO BOX 4007
MARYVILLE TN 37802-4007

LEGEND(S) — MILEAGE NOT REQUIRED

OWNER(S) NAME AND ADDRESS
MICHAEL R PIOTTER
1105 MULBERRY ST
ELDORADO IL 62930

FIRST LIENHOLDER NAME AND ADDRESS
VANDERBILT MORTGAGE & FINANCE INC
PO BOX 4007
MARYVILLE TN 37802-4007

SECOND LIENHOLDER NAME AND ADDRESS

### RELEASE OF LIEN

Lienholder on the vehicle described in this Certificate does hereby state that the lien is released and discharged.

Signature of Authorized Agent

Signature of Authorized Agent

**NEW LIEN ASSIGNMENT:** The information below may be on an application for title and presented to the Secretary of State.

Second Lienholder                    Address

Federal and State law requires that you state the mileage in connection with the transfer of ownership. Failure to complete or providing a false statement may result in fines and/or imprisonment.

### ASSIGNMENT OF TITLE

I, undersigned hereby certify that the vehicle described in this title has been transferred to the following printed name and address:

I certify to the best of my knowledge that the odometer reading is the actual mileage of the vehicle unless one of the following statements is checked:
☐ The mileage stated is in excess of its mechanical limits.
☐ The odometer reading is not the actual mileage. WARNING-ODOMETER DISCREPANCY

☐ If this vehicle is one of more than 5 commercial vehicles owned by me, I certify also that the vehicle is not damaged in excess of 33 1/3% of its fair market value unless this document is accompanied by a salvage application.

| ODOMETER READING | | DATE OF SALE |
|---|---|---|

Printed Name(s) of Seller(s)

Signature(s) of Seller(s)

Printed Name

Jesse White, Secretary of State of Illinois, do hereby certify that according to the records on file with my Office the person or entity named hereon is the owner of the vehicle described hereon, which is subject to the above named liens and encumbrances, if any. IN WITNESS WHEREOF, I HAVE AFFIXED MY SIGNATURE AND THE GREAT SEAL OF THE STATE OF ILLINOIS, AT SPRINGFIELD.

CONTROL NO. G6907858

*Jesse White*
JESSE WHITE, Secretary of State

DO NOT ACCEPT TITLE SHOWING ANY ERASURES, ALTERATIONS OR

EXHIBIT
2

Image# 001096720019 Type: MTGE
Recorded: 08/14/2008 at 02:08:24 PM
Total Amt: $56.00 Page 1 of 19
IL Rental Housing Fund: $10.00
Saline County Clerk and Recorder
Willie McClusky
File# 225199
BK 1941 PG 758-776

After Recording Return To:
Vanderbilt Mortgage & Finance, Inc.
Maryville, TN 37804
500 Alcoa Trail
Attn: Jackie Gray (361939)

Vanderbilt Mortgage & Finance, Inc.
Prepared by: Donna Vineyard
500 Alcoa Trail
Maryville, TN 37804
Closing Date: 7/21/08

_____ [Space Above This Line For Recording Data] _____

# MORTGAGE

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated 7/21/2008 ,
_____, together with all Riders to this document.

(B) "Borrower" is Michael R. Piotter. Borrower is the mortgagor under this Security Instrument.

(C) "Lender" is Vanderbilt Mortgage & Finance, Inc.  Lender is a corporation organized and existing under the laws of the state of Tennessee.  Lender's address is 500 Alcoa Trail, Maryville, Tennessee 37804.  Lender is the mortgagee under this Security Instrument.

(D) "Note" means the promissory note signed by Borrower and dated of even date.  The Note states that Borrower owes Lender eighty-eight thousand, six hundred ninety-two and 38/100 Dollars (U.S. $88,692.38) plus interest.  Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than  August 01, 2038.

(E) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(F) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(G) "Riders" means all Riders to this Security Instrument that are executed by Borrower.  The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ Other(s) [specify] _____ |
| ☐ 1-4 Family Rider | ☐ Biweekly Payment Rider | |

(H) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

ILLINOIS—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3014  1/01  (page 1 of 16 pages)

BOOK 1941 PAGE 0758

(I) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(J) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(K) "Escrow Items" means those items that are described in Section 3.

(L) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(M) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(N) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(O) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(P) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby

mortgage, grant and convey to Lender and Lender's successors and assigns the following described property located in the county of  Saline

Which currently has the address of: 1105 Mulberry Street, Eldorado, Illinois 62930

With legal description attached as: Exhibit A

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

ILLINOIS—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3014   1/01 (page 3 of 16 pages)

BOOK 1941 PAGE 0760

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds

BOOK 1941 PAGE 0761

for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

ILLINOIS—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3014   1/01 (page 5 of 16 pages)

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those enforcement are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall

ILLINOIS—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3014   1/01  *(page 6 of 16 pages)*

include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

BOOK 1941 PAGE 0764

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

ILLINOIS—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3014  1/01 *(page 8 of 16 pages)*

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing

ILLINOIS—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3014   1/01 *(page 9 of 16 pages)*

losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss

in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

ILLINOIS—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3014   1/01  (page 11 of 16 pages)

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

ILLINOIS—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT            Form 3014   1/01  *(page 12 of 16 pages)*

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to Section 22 of this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged unless as otherwise provided under Applicable Law. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

ILLINOIS—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3014  1/01  *(page 13 of 16 pages)*

BOOK 1941 PAGE 0770

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

ILLINOIS—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT      Form 3014   1/01  *(page 14 of 16 pages)*

BOOK 1941 PAGE 0771

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Waiver of Homestead. In accordance with Illinois law, the Borrower hereby releases and waives all rights under and by virtue of the Illinois homestead exemption laws.

25. Placement of Collateral Protection Insurance. Unless Borrower provides Lender with evidence of the insurance coverage required by Borrower's agreement with Lender, Lender may purchase insurance at Borrower's expense to protect Lender's interests in Borrower's collateral. This insurance may, but need not, protect Borrower's interests. The coverage that Lender purchases may not pay any claim that Borrower makes or any claim that is made against Borrower in connection with the collateral. Borrower may later cancel any insurance purchased by Lender, but only after providing Lender with evidence that Borrower has obtained insurance as required by Borrower's and Lender's agreement. If Lender purchases insurance for the collateral, Borrower will be responsible for the costs of that insurance, including interest and any other charges Lender may impose in

ILLINOIS—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3014   1/01 (page 15 of 16 pages)

connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to Borrower's total outstanding balance or obligation. The costs of the insurance may be more than the cost of insurance Borrower may be able to obtain on its own.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____          _Michael R. Poulter_____(Seal)
                                                                    - Borrower

_____          _____(Seal)
                                                                    - Borrower

_____ [Space Below This Line for Acknowledgment] _____

STATE OF ILLINOIS

COUNTY OF __Wayne____

THIS INSTRUMENT WAS ACKNOWLEDGED BEFORE ME BY _Michael R. Poulter_____

ON __July 21st_____, 20 08.

_S J Pollard_____          _Amy J. Pollard_____
NOTARY PUBLIC, STATE OF ILLINOIS          NOTARY PRINTED NAME

MY COMMISSION EXPIRES: __12/6/2008____

AMY J. POLLARD
OFFICIAL SEAL
Notary Public, State of Illinois
My Commission Expires
December 06, 2008

ILLINOIS—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    Form 3014   1/01  (page 16 of 16 pages)

## Exhibit A

The surface only of a tract of land described as follows, to wit: Beginning at the Southwest corner of the Northwest Quarter (NW/4) of the Southeast Quarter (SE/4) of Section Twenty (20), Township Eight (8) South, Range Seven (7) East of the Third Principal Meridian, Saline County, Illinois, and running East on the land line 262 feet; thence North parallel with land line 100 feet for a beginning point; thence North 100 feet; thence East parallel with the land line 200 feet to Mulberry Street in Beulah Heights Sub-division; thence South along said street 100 feet; thence West 200 feet to the point of beginning.

BOOK 1941 PAGE 0774

## POST-PETITION PAYMENT HISTORY

| Post-Petition Due Date | Date Payment Received | Amount Due | Amount Received | Late Charges | Notes |
|---|---|---|---|---|---|
| 05-30-2014 | N/A | $1,045.00 | N/A | | first plan payment not due until 05-30-2014 |



EXHIBIT
3